EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

MEMPHIS, LIGHT, GAS & WATER DIVISION, a division of the City Of Memphis, Defendant.

No. 14–cv–2143–TMP.

United States District Court, W.D. Tennessee, Western Division.

Signed July 31, 2015.

Gerald L. Thornton, Matthew H. McCoy, Equal Employment Opportunity

Commission–Memphis, Memphis, TN, for Plaintiff.

Jeff Weintraub, Edward F. Harold, Fisher and Phillips, LLP, Memphis, TN, for Defendant.

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

TU M. PHAM, United States Magistrate Judge.

Before the court is defendant Memphis, Light, Gas & Water Division's ("MLGW") Motion for Summary Judgment, filed on April 6, 2015. (ECF No. 29.) Plaintiff Equal Employment Opportunity Commission ("EEOC") filed a response in opposition on May 6, 2015. (ECF No. 33.) MLGW filed a reply on May 21, 2015. (ECF No. 34.) For the reasons below, MLGW's Motion for Summary Judgment is DENIED.[1]

## I. BACKGROUND

The EEOC brings this complaint alleging that MLGW violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., by not selecting one of its own employees, Carlos Phifer, for the position of Computer Operator Specialist 1 ("COS 1") because of his age (57 years old at the time).[2] In 2004, MLGW hired Phifer in the position of part-time Records Retention Clerk. (Def.'s Statement of Material Facts ("SMF") ¶ 1; Pl.'s

Resp. to Def.'s SMF ¶ 1.) Phifer worked on rotation as a COS 1 from March 2007 through December 2007. From January 2008 through April 2009, Phifer served as the acting Chief of Data Processing and Records Retention. Thereafter, he worked as a Clerical Support III and Service Advisor. He is currently employed by MLGW as a Service Advisor and has held that position since July 2011.[3] (Def.'s SMF ¶ 2; Pl.'s Resp. to Def.'s SMF ¶ 2; Def.'s Resp. to Pl.'s Statement of Additional Facts ("SAF") ¶ 2.) In his current position, Phifer works approximately ten hours a week of overtime. (Def.'s SMF ¶ 54; Pl.'s Resp. to Def.'s SMF ¶ 54.)

On May 17, 2011, MLGW posted notice that it was looking to hire a full-time COS 1 to work in the Data Processing and Records Retention area.[4] (Pl.'s Resp. to Def.'s SMF ¶ 4; Price Dep. 88, 94; Ex. 7 to Price Dep., Job Posting.) The COS 1 position is a non-bargaining unit position within MLGW. (Id.) According to the job posting and job description, the purpose and duties of the COS 1 position consist of the following:

> Monitor, operate, control and set controls on various application schedules, multi-programmed and multi-processing computer and peripheral equipment; process/load input and output data; control/secure magnetic tapes; resolve technical/operational problems for internal and external customers; prepare/main-

---

1. All parties have consented to have a United States Magistrate Judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings.(ECF No. 16.)

2. The following facts are viewed in the light most favorable to the nonmoving party, the EEOC.

3. Before joining MLGW, Phifer worked in computer operations for the United States Air Force, where he also obtained an A.A.S. de-

gree in computer operations from the Community College of the Air Force. (Pl.'s Resp. to Def.'s SMF ¶ 2; Def.'s Resp. to Pl.'s SAF ¶ 2.)

4. The COS 1 vacancy became available after MLGW employee Corey Taylor was promoted. (Def.'s SMF ¶¶ 4, 5; Pl.'s Resp. to Def.'s SMF ¶¶ 4, 5.) Taylor had worked in the COS 1 position for MLGW until May 2011. Taylor had performed both operations side and service desk side duties. (Pl.'s Resp. to Def.'s SMF ¶ 4; Price Dep. 87–89.)

tain data files and various records and reports; and maintain materials and supplies.

(Pl.'s Resp. to Def.'s SMF ¶ 6; Price Dep. 84–85, 94–96, Ex. 8 to Price Dep., COS 1 Job Description.) The work environment for the COS 1 position is described as "works majority of the time in the computer room; occasionally required to work on loading dock and driving in traffic." (Id.) The COS 1 job had traditionally included two separate duties: working on the service desk and performing hands on operations on the main frame computer, known as "operations." (Def.'s SMF ¶ 6; Price Dep. 51–52; Ex. 8 to Price Dep.) The operations side duties include monitoring, operating, and setting controls on various computer applications, monitoring and submitting jobs, checking for and fixing add-bins (when an error in the computer system causes it to kick it out), referring jobs to computer programmers when necessary, and reviewing reports. (Pl.'s Resp. to Def.'s SMF ¶ 6; Price Dep. 51–52; Ex. 8 to Price Dep., Job Description.) The service desk side duties consist of resolving technical/operational problems for internal and external customers, such as resending passwords to users or pushing software to a user's personal computer. (Id.) According to Vickie Price, MLGW's Supervisor of Data Processing and Records Retention, a COS 1 must have the ability to work on both the operation side and the service desk side. (Id.)

MLGW posted the COS 1 vacancy both internally and externally. (Def.'s SMF ¶ 7; Pl.'s Resp. to Def.'s SMF ¶ 7). MLGW managers must get approval from MLGW's President, Jerry Collins, to post a position externally. (Pl.'s Resp. to Def.'s SMF ¶ 7; Pl.'s Resp. to Def.'s SAF ¶ 7.) Elvis Morgan, MLGW's Manager of Information Technology, submitted an email to Collins requesting to post the COS 1 position externally. (Id.) In this email, Morgan stated that "[i]n the past it has been a challenge finding qualified internal candidates with the technical computer operations and customer service skills required on the Computer Operations/Service Desk team." (Id.) Morgan also noted that "[t]he immediate need is to have a resource on the I.T. Service Desk, serving as first level support on technology problems. This resource will also work, as needed, on any of the 3 shifts in computer operations." (Id.)

MLGW's Employee Handbook contains a policy regarding promotions and transfers. The policy states as follows:

Promotions and Transfers (Bid System)[5]

Upon completion of the initial probationary period, full-time employees are eligible to bid on posted job vacancies. Part-time and temporary employees of MLGW may also bid on clerical positions, but will be considered only when there are no qualified bidders who are full-time employees. Part-time and temporary employees wishing to apply for permanent positions other than clerical positions must follow the same procedures as external applicants.

(Pl.'s Resp. to Def.'s SMF ¶ 27; Leonard Dep. 84–85; Ex. 5 to Leonard Dep., Employee Handbook.) According to Eric Conway, MLGW's Human Resources Generalist, under this policy a qualified full-time employee should be awarded a position over a part-time, temporary, or external applicant. (Id.; Conway Dep. 42–46.)

Phifer submitted a timely application for the COS 1 position. Conway reviewed the applications in light of the requirements

---

5. This policy applies to both bargaining and non-bargaining unit positions. (Pl.'s Resp. to Def.'s SMF ¶ 27.)

and duties listed on the job description, as well as specific information outlined in an April 28, 2010 email from Price, which stated that the necessary qualifications included "familiar with the Main Frame System, TSO, CA7 interface system for job production, forecasting the holiday schedule, and be familiar with the output and input Queue." (Pl.'s Resp. to Def.'s. SMF ¶ 9; Conway Dep. at 68; Ex. 10 to Conway Dep.) After reviewing the applications, MLGW selected three individuals for interviews: Phifer, Betty Ann Joiner (37 years old at the time), and Rita McClain.[6] (Def.'s SMF ¶ 10; Pl.s' Resp. to Def.'s SMF ¶ 10.) Joiner, who had worked on MLGW's service desk from January 2010 through August 5, 2011, was not an employee of MLGW. She was employed by Stragistic Technology, which placed her at MLGW, and therefore she was considered an external candidate. (Def.'s SMF ¶¶ 43, 44; Pl.'s Resp. to Def.'s SMF ¶¶ 43, 44.)

The panel of interviewers consisted of Price, Conway, and MLGW's Chief Computer Operator, Dianne Moore. (Def.'s SMF ¶ 11; Pl.'s Resp. to Def.'s SMF ¶ 11.) The panel conducted interviews for the COS 1 position on August 1 and 2, 2011. Each candidate was asked the same set of questions, which covered various topics, such as education, experience, training, and qualifications. (Def.'s SMF ¶ 12; Pl.'s Resp. to Def.'s SMF ¶ 12.) The response to each question was scored on a scale of 0 to 3. (Def.'s SMF ¶ 14; Pl.'s Resp. to Def.'s SMF ¶ 14.) Immediately following each candidate's interview, the interview panel discussed the candidate's responses and came to a consensus as to the appropriate score for each response. (*Id.*) The scores for each response were then totaled and

averaged, giving each candidate an overall average score for the interview. (Def.'s SMF ¶¶ 14, 15; Pl.'s Resp. to Def.'s SMF ¶¶ 14, 15.) An interview average of 1.75 to 2.49 placed the candidate in the "Clearly Acceptable" category, while a score of 2.50 or higher placed the candidate in the "Superior" category. (Pl.'s Resp. to Def.'s SMF ¶ 14.) Phifer, with an average score of 2.6, was the only candidate who received an interview score in the "Superior" category. (Def.'s SMF ¶¶ 16, 17; Pl.'s Resp. to Def.'s SMF ¶¶ 16, 17; Def.'s Resp. to Pl.'s SAF ¶ 16.) The summary comments and observations noted on the interview records indicated that Phifer had experience working as a COS 1 on rotation, prior operations experience, passion for the job, and people skills. For weaknesses, the interview records indicated "none observed." (Pl.'s Resp. to Def.'s SMF ¶ 16; Conway Dep. 104–07; Ex. 16 to Conway Dep., Phifer Interview Record; Def.'s Resp. to Pl.'s SAF ¶ 16.)

Both Joiner and McClain received interview scores of 2.0, placing them in the "Clearly Acceptable" category. (Def.'s SMF ¶¶ 18–21; Pl.'s Resp. to Def.'s SMF ¶¶ 18–21.) The summary comments and observations on interview records indicated that Joiner had "no operations experience." (Pl.'s Resp. to Def.'s SMF ¶ 18; Def.'s Resp. to Def.'s SAF ¶ 18; Conway Dep. 101–04, 106–07; Ex. 15 to Conway Dep., Joiner Interview Record.) Conway found that Joiner "struggled with the interview as far as answering the questions, so I questioned if she truly had the ability." (Pl.'s Resp. to Def.'s SMF ¶ 46; Conway Dep. 122–23.) With regard to McClain, the summary comments and observations noted "no full-time experience

---

6. MLGW asserts that Price met with Conway to review applications and to determine which candidates would receive interviews. (Def.'s SMF ¶ 10). The EEOC disputes this and states that Conway alone selected which candidates would be interviewed, and that Price only reviewed the applications of the candidates selected by Conway for interviews. (Pl.'s Resp. to Def.'s SMF ¶ 10.) This factual dispute is immaterial to resolving the Motion for Summary Judgment.

**1024**

doing consistent Computer Operations Specialist functions." (Pl.'s Resp. to Def.'s SMF ¶ 20; Def.'s Resp. to Pl.'s SAF ¶ 20; Conway Dep. 98–101; Ex. 14 to Conway Dep., McClain Interview Record.)

After the interview panel scored the three candidates, the panel unanimously determined that Phifer was the most qualified and the best fit to fill the vacancy. (Def.'s SMF ¶ 22; Pl.'s Resp. to Def.'s SMF ¶ 22.) Price testified that Phifer "was the most qualified candidate for the position ... [a]ll three of us collectively stated that he was the best person for the job based on what the job description was requiring and based on his experience; based on how well he interviewed and based on his scores. So there wasn't any doubt." (Id.; Price Dep. 41–42, 148.) Conway testified that "[Phifer] was rated higher and we all felt he was the best qualified candidate," that Phifer "had the perfect combination" of interview scores, experience, and department fit, that he "would have been a perfect fit," and that "[w]e all agreed that [Phifer] was the one who would be selected." (Pl.'s Resp. to Def.'s SMF ¶ 22; Conway Dep. 121–23; Ex. 2 to Conway Dep., Conway Aff.) Moore noted, "I knew [Phifer] was the most qualified person," and Price and Conway all said Phifer "was the most qualified person." (Pl.'s Resp. to Def.'s SMF ¶ 22; Ex. 2 to Moore Dep., Moore Aff.) Accordingly, the interview panel selected Phifer for the position. (Pl.'s Resp. to Def.'s SMF ¶ 22.) Price told Conway and Moore

that she would let Morgan (her direct manager) know the panel had selected Phifer and then fill out the MLGW selection card, while Conway started the paperwork to make the offer to Phifer. (Id.)

Most of the facts surrounding the events that followed the interviews are in dispute. According to the EEOC, when Price reported the panel's selection of Phifer to Morgan the next day, Morgan challenged the selection and refused to allow Price to move forward with extending the offer to Phifer. (Pl.'s Resp. to Def.'s SMF ¶ 24.) Instead, Morgan told Price the position should go to Joiner. (Pl.'s Resp. to Def.'s SMF ¶ 25; Price Dep. 147–49.) During his meetings with Price, Morgan "kept talking about" Phifer's age, retirement, and health condition. (Pl.'s Resp. to Def.'s SMF ¶ 28). Price testified that Morgan made the following comments and asked the following questions during their discussions of the candidates:

(1) "How old is [Phifer]?"

(2) "When does [Phifer] plan to retire?"

(3) "Well, what about [Phifer's] age?"

(4) "Isn't he getting closer to retirement?"

(5) "[W]hat kind of health is [Phifer] in?" [7]

(6) "[W]e're looking for young blood with new ideas."

(Id.; Price Dep. 139–40, 203.) [8] Price testified that her discussions with Morgan led her "to believe [Morgan] felt [Phifer] was old." [9] (Id.) Price's position on the selec-

7. Price testified that during this conversation, Morgan stated he was aware that Phifer was undergoing dialysis. (Price Dep. 140.)

8. The EEOC asserts that at her deposition, Price testified that Morgan made the statement "[Phifer] is older, you know, we don't know how long it's going to be, but this lady here is a little bit younger, so she'll be here for awhile." However, a more accurate reading of the deposition testimony shows that this was not a statement attributable to Mor-

gan, but rather Price's personal interpretation of the phrase "see future with employee" contained in the August 11, 2011 email. (Price Dep. 160–61.)

9. The EEOC further contends that throughout these discussions, Morgan offered "shifting" explanations to justify his preference for Joiner. For example, Morgan did not mention anything about Joiner's qualifications or experience to Price or Moore. Rather, Morgan told Moore "we need to help the economy;

tion was memorialized in an email to Morgan dated August 11, 2011. In that email, Price outlined some of Joiner's qualifications for the position, but then stated "I cannot in good conscience sign the Departmental Interview Record (DIR) card selecting Betty Ann Joiner. I will not be able to defend the statements in court should one of the internal candidates file charges."[10] (Pl.'s Resp. to Def.'s SMF ¶ 28; Price Dep. 159–62; Ex. 15 to Price Dep.) When questioned about this email during her deposition, Price explained that Joiner's qualifications listed in the email actually came from Morgan. (*Id.*) Ultimately, over Price's and Conway's objections, Morgan instructed Price to offer the COS 1 position to Joiner.[11] (Def.'s SMF ¶ 27; Pl.'s Resp. to Def.'s SMF ¶ 27; Pl.'s Resp. to Def.'s Mot. for Summ. J. at 7.) Price felt Morgan "coerced/made" her offer the position to Joiner and that Phifer's age was a factor in Morgan's decision. (Pl.'s Resp. to Def.'s SMF ¶ 27; Price Dep. at 13, 192–94; Ex. 2 to Price Dep.)

MLGW offers a very different account of the events. According to MLGW, in June 2011, MLGW hired Lashell Vaughn as Vice President, Chief Technology Officer, Information Systems ("IS Division"). (Def.'s SMF ¶ 31; Pl.'s Resp. to Def.'s SMF ¶ 31.) Shortly after her hire, Vaughn began considering a reorganization of the IS Division. (Def.'s SMF ¶ 32; Pl.'s Resp. to Def.'s SMF ¶ 32.) As part of the process, Vaughn reviewed the positions in the IS Division, both open and filled. (Def.'s SMF ¶ 33; Pl.'s Resp. to Def.'s SMF ¶ 33.) When she considered the vacant COS 1 position, she initially concluded it should not be filled. (Def.'s SMF ¶ 34; Pl.'s Resp. to Def.'s SMF ¶ 34.) However, based on the possibility of losing the position entirely due to the budgeting process that sometimes eliminated vacant positions, she advised Morgan to move forward with filling the position. (Def.'s SMF ¶ 35; Pl.'s Resp. to Def.'s SMF ¶ 35.) In light of her planned restructuring, she advised Morgan the position would work solely on the service desk and the operator duties that were related to servicing the mainframe were not going to be utilized.[12] (Def.'s SMF ¶ 36.) Vaughn instructed Morgan not to share this information with his department. (Def.'s SMF ¶ 37; Vaugh Dep. 53.) Vaughn did not share this information with Price at the time, and neither Conway nor Moore knew the position would only involve service desk duties. (Def.'s SMF ¶¶ 38, 39; Price Dep. 163; Conway Dep. 110, 118–20; Moore Dep. 84.) Price did not become aware that the position would no longer perform computer operator duties until sometime after the interviews, when Morgan advised her of the planned restructuring. (Def.'s SMF

---

that [Phifer] have [sic] a job and [Joiner] need [sic] one." (Pl.'s Resp. to Def.'s SMF ¶ 30; Moore Dep. 75–76; Ex. 2 to Moore Dep., Moore Aff.) He told Price to hire Joiner because "she's a single parent; doesn't have a full-time job." (Pl.'s Resp. to Def.'s SMF ¶ 46; Price Dep. 147–48.) However, on another occasion, Morgan said he wanted to select Joiner "on her initiatives." (Pl.'s Resp. to Def.'s SMF ¶ 29; Conway Dep. 160–66; Ex. 25 to Conway Dep.)

10. [Missing text].

11. Moore testified in her deposition that Morgan did not tell the interview panel to select Joiner. (Pl.'s Resp. to Def.'s SMF ¶ 30; Moore Dep. 92–93.)

12. The EEOC contends that the position was intended to work on the service desk from the beginning and the planned restructuring did not affect this. (Pl.'s Resp. to Def.'s SMF ¶ 36; Morgan Dep. 5051, 87–88.) The EEOC also argues that Vaughn's instructions would have violated MLGW's policies and procedures because the COS 1 job description and job posting contained both operations side and service desk side duties. (Pl.'s Resp. to Def.'s SMF ¶¶ 6, 36.)

¶ 40; Ex. 2 to Price Dep.) Price recalled this conversation occurred three or four months after June 2011. (Def.'s SMF ¶ 41; Price Dep. at 163–64.) The departmental restructuring took place in late 2011. (Def.'s SMF ¶ 42.)

According to MLGW, Morgan believed Joiner was a better candidate for the COS 1 position than Phifer.[13] (Def.'s SMF ¶ 46; Morgan Dep. 53.) Morgan testified that Joiner had been performing the specific service desk duties the position was going to require for the last 18 months, making her familiar with the technologies the company was using at the time. (Def.'s SMF ¶¶ 47–50; Morgan Dep. 75.) Joiner had exhibited initiative while working as a contractor by inquiring about training opportunities. (Id. at 60.) Morgan "never heard nor saw" the same initiative from Phifer. (Id. at 61.) Morgan believed Joiner "would probably bring more forward thinking to the team as far as processing, improvements, that kind of thing; maybe even had a stronger growth potential." (Id. at 38–39.)

Morgan testified he never made any reference to Phifer's age, retirement, or health. (Pl.'s Resp. to Def.'s SMF ¶ 28; Morgan Dep. 62–63, 66–70.) Morgan testified that he did not know what Price meant by her statements in the August 11 email (regarding not being able in good conscience to select Joiner) and did not remember asking her, but believed Price saw Joiner as a strong candidate for the position. (Id.) Morgan further testified the interview panel struggled with making a selection between two qualified candidates. According to Morgan, Price and the other members of the interview panel "kept wavering" about the selection. (Pl.'s Resp. to Def.'s SMF ¶ 22; Morgan Dep.

34–35, 47–48, 73–76.) Even after several meetings, Price expressed that the selection was a "[t]ough decision, one of the toughest decisions ... she'd been faced with; you know, two candidates; not sure which one." (Id.) Morgan asked questions and served as a sounding board, but told Price that the decision was ultimately up to her. (Id.) ("I told her on several occasions, pick someone; it doesn't matter to me; it's your call; just select someone.") Rutha Griffin, MLGW's Manager of Employment Services, testified that she was called into a meeting with the interview panel because they had two qualified candidates and could not decide between the two. (Pl.'s Resp. to Def.'s SMF ¶ 22; Griffin Dep. 60–65.) Additionally, Virginia Leonard, MLGW's Senior Human Resources Representative, testified that there "were a series of meetings between [Price] and [Morgan]. And [Morgan] had stated that at one time, [Price] was going to pick [Joiner], and then, the next time she is going to pick [Phifer], and that she was going back and forth, back and forth, and that [Morgan] needed her to make a choice. But I did not get any evidence that [Morgan] tried to force her to pick one candidate over the other." (Pl.'s Resp. to Def.'s SMF ¶ 22; Leonard Dep. 100–01.)

MLGW offered the COS 1 position to Joiner on September 9, 2011, which she accepted. (Def.'s SMF ¶ 27; Pl.'s Resp. to Def.'s SMF ¶ 27.) Since accepting the job, Joiner has worked exclusively on the service desk. (Def.'s SMF ¶ 52; Joiner Dep. at 24–25; Pl.'s Resp. to Def.'s SMF ¶ 52.) Employees on the service desk do not receive overtime pay. (Def.'s SMF ¶ 55; Pl.'s Resp. to Def.'s SMF ¶ 55.)

---

13. The EEOC disputes this fact. It points out that, among other things, Morgan did not review the applications, had no involvement in the interviews, did not review the interview records, and did not inquire about Phifer's initiative and willingness to learn. (Pl.'s Resp. to Def.'s SMF ¶ 46.)

## II. ANALYSIS

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a); *see also Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir.2009). In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted). "The moving party bears the initial burden of production." *Palmer v. Cacioppo*, 429 Fed.Appx. 491, 495 (6th Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the moving party has met its burden, "the burden shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.'" *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "[I]f the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which the nonmovant has the burden, the moving party is entitled to summary judgment as a matter of law." *Thompson v. Ashe*, 250 F.3d 399, 405 (6th Cir.2001). "The central issue 'is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Palmer*, 429 Fed.Appx. at 495 (quoting *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505).

### B. ADEA

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge ... or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To prevail on an age discrimination claim, "it is not sufficient for the plaintiff to show that age was a motivating factor in the adverse action; rather, the ADEA's 'because of' language requires that a plaintiff prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the 'but-for' cause of the challenged employer decision." *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 529 (6th Cir.2014) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009)) (internal quotation marks omitted). "For an employer to take an adverse action 'because of age' means that age 'was the 'reason' that the employer decided to act." (*Id.*) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, —— U.S. ——, 133 S.Ct. 2517, 2527, 186 L.Ed.2d 503 (2013)) (internal quotation marks omitted). "An employee can establish an age discrimination case by either direct or circumstantial evidence." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir.2008). "Before *Gross*, our circuit defined direct evidence as that evidence 'which, if believed, requires the conclusion that unlawful discrimination was *at least a motivating factor* in the employer's actions.'" *Scheick*, 766 F.3d at 530 (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir.2003) (en banc)) (emphasis added). "Because *Wexler's* definition does not survive in the ADEA context after *Gross*, we now look to whether evidence, if believed, requires the conclusion that age was the 'but for' cause of the employment decision."[14] *Id.; see also Slo-*

---

14. The EEOC argues that the Sixth Circuit

has continued to analyze whether age is "at

*ban v. Mahoning Youngstown Cmty. Action P'ship.*, 604 Fed.Appx. 407, 410 (6th Cir.2015) (same). The direct evidence upon which a plaintiff seeks to rely must establish not only that a defendant was predisposed to discriminate on the basis of a protected characteristic, but also that the defendant acted on that predisposition in taking the adverse employment action in question. *DiCarlo v. Potter,* 358 F.3d 408, 415 (6th Cir.2004), *abrogated in part on other grounds by Gross,* 557 U.S. at 177, 129 S.Ct. 2343. "In other words: Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Scheick,* 766 F.3d at 530 (quoting *Rowan v. Lockheed Martin Energy Sys., Inc.,* 360 F.3d 544, 548 (6th Cir.2004)) (internal quotation marks omitted).

### 1. Direct Evidence

■ The EEOC argues that it has presented direct evidence of age discrimination. Courts look to the following factors in assessing whether a statement qualifies as direct evidence: "(1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they

were made proximate in time to the [adverse action]." *Peters v. Lincoln Elec. Co.,* 285 F.3d 456, 478 (6th Cir.2002). "None of these factors is individually dispositive of age discrimination, but rather, they must be evaluated as a whole, taking all of the circumstances into account." *Id.* (citing *Cooley v. Carmike Cinemas, Inc.,* 25 F.3d 1325, 1330 (6th Cir.1994)).

■ Price testified that during her discussions with Morgan about filling the COS 1 position, Morgan asked her about Phifer's age, when he planned to retire, whether he was "getting closer to retirement," and his health. Morgan also made the comment, "[w]e're looking for young blood with new ideas." [15] These alleged statements were made by the decision maker, were related to the decision-making process, and were made proximate in time to the adverse action. The key issue, then, is whether these statements were more than merely vague, ambiguous or isolated remarks, so as to establish that Morgan was predisposed to discriminate on the basis of age and that he acted on that predisposition in denying Phifer the position. The court finds that Morgan's questions about Phifer's age, when he planned to retire, whether he was "getting closer to retirement," and his health, do not constitute direct evidence of age discrimination, because they would require

least a motivating factor" to determine whether ageist remarks constitute direct evidence, even post-*Gross.* (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 9 n. 9) (citing *Brewer v. New Era, Inc.,* 564 Fed.Appx. 834, 839 (6th Cir.2014); *Aldridge v. City of Memphis,* 404 Fed.Appx. 29, 40 (6th Cir.2010); *Geiger,* 579 F.3d at 620). However, the cases cited by the EEOC merely restate the *Wexler* definition without discussing the Supreme Court's opinion in *Gross* or its impact on the *Wexler* definition. The EEOC's response brief makes no mention of the *Scheick* opinion.

**15.** As discussed in footnote 8, and contrary to the EEOC's interpretation of Price's testimo-

ny, Price did not testify that Morgan made the statement, "[Phifer] is older, you know, we don't know how long its going to be, but this lady here is a little bit younger, so she'll be here for awhile." Instead, that testimony reflects Price's interpretation of the phrase "see future with employee" contained in her August 11 email. Other examples of direct evidence cited by the EEOC include testimony from Price about her personal interpretation of various statements made by Morgan that she believed indicated Morgan was concerned about Phifer's age. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 11.) Again, Price's personal opinions about Morgan's statements are not direct evidence of discrimination.

the trier of fact to make inferences in order to conclude that Morgan's decision was based on his discriminatory animus. Whether Morgan's statement, "[w]e're looking for young blood with new ideas," constitutes direct evidence is a closer question. Direct evidence of discrimination is "evidence of conduct or statements by persons involved in making the employment decision directly manifesting a discriminatory attitude, of a sufficient quantum and gravity that would allow the factfinder to conclude that attitude more likely than not" was the but-for cause of the employment decision. *Scott v. Potter*, 182 Fed. Appx. 521, 525–26 (6th Cir.2006) (quoting *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 724 (8th Cir.2001)) (internal quotations omitted). "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, satisfy this criteria." *Sharp v. Aker Plant Servs. Grp., Inc.*, 726 F.3d 789, 798 (6th Cir.2013) (quoting *Scott*, 182 Fed. Appx. at 526) (internal quotation marks omitted). The court finds that Morgan's statement, "[w]e're looking for young blood with new ideas," does not rise to the level of direct evidence of age discrimination. Although a jury could interpret the statement to mean that Morgan did not want to give the position to Phifer because he thought Phifer was too old, it could also reasonably construe the statement to mean that Morgan wanted to hire Joiner because he thought she was better qualified for the "modified" COS 1 position and viewed her as someone who had fresh ideas.[16] Be-

cause the EEOC has not presented direct evidence of age discrimination, the court must next consider whether the EEOC has sufficiently presented circumstantial evidence of discrimination by analyzing its claim under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

### 2. Circumstantial Evidence

█ Under the *McDonnell Douglas* framework, the EEOC must first produce evidence to establish a *prima facie* case of age discrimination. To demonstrate a *prima facie* case, the EEOC must show that Phifer: (1) was a member of a protected class; (2) applied for and was qualified for a promotion; (3) was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job. *Hicks v. SSP America, Inc.*, 490 Fed. Appx. 781, 783 (6th Cir.2012). "We have explained that on a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 390–91 (6th Cir.2009) (internal quotation marks and citations omitted). It is undisputed that Phifer was a member of a protected class (57 years old at the time), applied for and was qualified for the COS 1 position, was denied the position, and that Joiner (37 years old at the time) was awarded the job. For purposes of summary judgment,

---

**16.** Even if the court were to determine that one or more of Morgan's statements constituted direct evidence of discrimination, that determination would not necessarily end the court's analysis. In *Scheick*, the EEOC filed a brief as *amicus curiae* arguing (as it does in the present case) that the presentation of direct evidence of age discrimination necessarily precludes entry of summary judgment in favor of the employer. *Scheick*, 766 F.3d at 531. The Sixth Circuit rejected this argu-

ment, explaining that "even when direct evidence of age discrimination has been offered, the question to be asked in deciding an employer's motion for summary judgment is whether the evidence, taken as a whole and in the light most favorable to plaintiff, is sufficient to permit a rational trier of fact to conclude 'that age was the 'but-for' cause of the challenged employer decision.'" *Id.* at 532 (quoting *Gross*, 557 U.S. at 178, 129 S.Ct. 2343).

MLGW concedes that the EEOC has established its *prima facie* case. (Def.'s Mot. for Summ. J. at 4.)

▇▇▇ Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its adverse business decision. *Schoonmaker v. Spartan Graphics Leasing LLC*, 595 F.3d 261, 264 (6th Cir.2010). According to MLGW, traditionally a COS 1 had two different set of duties, service desk work and operations work. During the time that MLGW was looking to fill the COS 1 position, Morgan discussed with Vaughn, his supervisor, that due to a planned reorganization of the department, the position should be filled with the understanding that the person hired would have only service desk duties. (Vaughn Dep. 37–38, 51.) With this in mind, Morgan believed that Joiner was the better candidate. His belief was based on the following: (1) for the last 18 months, Joiner had been performing the specific service desk duties the position was going to require, making her familiar with the technologies the company was using at the time (Morgan Dep. 75); (2) Joiner had exhibited initiative while working as a contractor by inquiring about training opportunities (*id.* at 60); (3) Morgan "never heard nor saw" the same initiative from Phifer (*id.* at 61); and (4) Morgan believed Joiner "would probably bring more forward thinking to the team as far as processing, improvements, that kind of thing; maybe even had a stronger growth potential" (*id.* at 38–39). The court finds that MLGW has produced sufficient evidence from which a reasonable jury could conclude that MLGW had a legitimate, non-discriminatory reason for not selecting Phifer to fill the position.

▇▇▇ Since MLGW has met its burden of production, the burden shifts back to the EEOC to identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination. *Schoonmaker*, 595 F.3d at 264. "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir.2000). Even though Morgan's age-related questions and comments do not constitute direct evidence of age discrimination, his comments provide support to show that MLGW's employment decision was impermissibly based on Phifer's age. In addition to Morgan's questions and comments, the EEOC has presented evidence that (1) Phifer received the highest score of the three candidates, and was the only one who fell within the "Superior" category; (2) the summary comments and observations noted on the interview records showed that Phifer had experience working as a COS 1 on rotation, prior operations experience, passion for the job, and people skills, and no observed weaknesses; (3) Joiner received an interview score of 2.0, placing her in the lower "Clearly Acceptable" category; (4) Conway found that Joiner "struggled with the interview as far as answering the questions, so I questioned if she truly had the ability"; (5) the panel unanimously determined that Phifer was the most qualified and the best fit to fill the vacancy, and selected Phifer for the position; (6) Morgan refused to allow Price to move forward with extending the offer to Phifer and instructed Price to offer the position to Joiner; and (7) MLGW failed to follow its own policies and procedures by selecting an external candidate over a qualified full-time internal candidate. The court finds that this evidence, taken as a whole and viewed in the light most favorable to the EEOC, is sufficient to permit a reasonable jury to conclude that Phifer's age was the but-for cause of MLGW's employment de-

cision. Thus, the Motion for Summary Judgment on the ADEA claim is denied.

## C. Damages

MLGW also moves for summary judgment on the EEOC's claims for back pay and liquidated damages. MLGW argues that the EEOC has provided insufficient evidence to show what Phifer's pay would have been had he received the COS 1 job. MLGW has filed an affidavit from Leonard, setting forth Phifer's hourly pay and annual salary from September 18, 2011 through January 16, 2015, and comparing those wages with what he would have earned, over the same time period, had he received the COS 1 position. (Leonard Aff. ¶¶ 5–11.) Leonard avers that Phifer's salary for the COS 1 position was calculated by "work[ing] with the compensation department." (Id. ¶ 7.) She asserts that "the amounts he would have earned were certain based upon how MLGW determines pay for employees changing positions, i.e., there would have been no discretion in his rates of pay during this time." (Id. ¶ 8.) Based on these computations, Leonard states that Phifer has earned approximately $10,500 more in his current position than he would have earned had he received the COS 1 position. (Id. ¶ 9.) MLGW argues that because the EEOC cannot demonstrate Phifer has suffered any economic damages, MLGW is also entitled to summary judgment on the claim for liquidated damages. Collazo v. Nicholson, 535 F.3d 41, 45 n. 4 (1st Cir.2008).

■ "The goal of Title VII is to make persons whole for injuries suffered on account of unlawful employment discrimination." Cox v. Shelby State Cmty. Coll., 194 Fed.Appx. 267, 278 (6th Cir.2006) (quoting Suggs v. ServiceMaster Educ. Food Mgmt., 72 F.3d 1228, 1234 (6th Cir.1996)) (internal citations omitted). A back pay award is presumptively favored in employment discrimination cases. Id. The goal of a back pay award is to completely redress the economic injury suffered by the plaintiff as a result of the discrimination. Consequently, a back pay award includes an employee's base salary plus any raises that the employee could reasonably have expected to receive, sick leave, vacation pay, pension benefits, and other fringe benefits. See Rasimas v. Mich. Dep't of Mental Health, 714 F.2d 614, 626–27 (6th Cir. 1983).

■ In response, the EEOC cites to Conway's testimony that in making his salary recommendations to the compensation department, he will look at the percentage of the difference between the midpoints of the former position and the new position, as well as the salaries of other individuals who hold the same position. (Conway Dep. 82–83.) Conway also testified that "[i]t's going to be dependent on other things, too. If you've just gotten an increase, a merit increase, or something like that, it's just going to be a difference, and, again, that's going to be for compensation to make that determination." (Id. at 83.) The EEOC has presented evidence showing that in 2011, Phifer's annual salary was $43,118.40, while the salary range for the COS 1 position was $43,076.80 to $64,625.60 (with a mid-point range of $53,851.20). The EEOC has also presented evidence that the four current COS 1 employees earn annual salaries of $45,406.40, $46,945.60, $56,014.40, and $56,513.60. The EEOC points out that Leonard's affidavit does not describe how MLGW's compensation department made its determination that Phifer's starting hourly pay as a COS 1 in 2011 would have been $20.99 (only 26 cents more than his hourly pay of $20.73 as a Service Advisor).[17] Moreover, Leonard's statement that

---

17. Nor does the affidavit explain why Phifer's hourly salary as a Service Advisor after 2011

the compensation department lacked discretion in its salary determination would appear to conflict with Conway's testimony that the salary determination is based on several factors. Based on this evidence, the EEOC asserts that Phifer's annual salary as a COS 1 starting in 2011 would have been approximately $53,850 per year, much higher than the $43,659.20 salary calculated by MLGW.

 The court is mindful that "[b]ack pay should be awarded even where the precise amount of the award cannot be determined. Any ambiguity in what the claimant would have received but for discrimination should be resolved against the discriminating employer." *Hance v. Norfolk S. Ry. Co.*, 571 F.3d 511, 520 (6th Cir.2009) (quoting *Rasimas*, 714 F.2d at 628). The court finds that the EEOC has presented sufficient evidence to create a triable issue on its claim for economic damages. Therefore, the Motion for Summary Judgment as to economic damages and liquidated damages is denied.

### III. CONCLUSION

For the above reasons, MLGW's Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

increased at a higher rate as compared to his hypothetical hourly rate as a COS 1. (ECF No. 29–11, Ex. to Leonard Aff.) Presumably, the difference is attributable to the Service

Advisor position being a bargaining unit position and the COS 1 being a non-bargaining unit position.